UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SERRA CHEVROLET, INC., <br><br> Plaintiff, <br><br> v. <br><br> GENERAL MOTORS, LLC, <br><br> Defendant. | Case No. 2:23-cv-1675-HDM |

## MEMORANDUM OPINION AND ORDER

Plaintiff Serra Chevrolet, Inc. ("Serra") sues Defendant General Motors, LLC ("GM") for breach of contract, violations of Alabama's Motor Vehicle Franchise Act, negligence, wantonness, and violations of the federal Dealer's Day in Court Act. This case is before the court on GM's motion to exclude the expert opinions and testimony of Patrick L. Anderson. (Doc. 49).

## LEGAL STANDARD

The motion to exclude in this case challenges the admissibility of expert witness testimony under Federal Rule of Evidence 702. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, "Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific [and technical] evidence." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (emphasis omitted) (citing *Daubert*, 509 U.S. at 589 n.7, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). The gatekeeping function "'inherently require[s] the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.* (emphasis omitted) (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002)).

These requirements boil down to a "rigorous three-part inquiry": district courts must consider whether (1) the expert is qualified to testify; (2) the expert's methodology is sufficiently reliable; and (3) the testimony assists the trier of fact. *Id.* "While there is inevitably some overlap among the basic requirements—

2

qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." *Id.* "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Id.* Under the 2023 amendments to Rule 702, the court must find by a preponderance of the evidence that the proffered testimony meets the admissibility requirements. Fed. R. Evid. 702 advisory committee's note to 2023 amendment. "Nothing in the amendment imposes any new, specific procedures." *Id.* Rather, the rule was amended to emphasize that arguments about the sufficiency of an expert's basis will not always go to weight rather than admissibility. *Id.* But the advisory committee's notes clarify that "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." *Id.*

### I) Helpfulness and Qualification

First, GM does not argue that Anderson's testimony will not assist the trier of fact, and, after thorough review, the court finds that it will.[1] Second, although GM does not explicitly argue that Anderson is not qualified to act as an expert in this case, GM does state that Anderson merely "purports" to be an economic expert, is not an accountant, and "only holds degrees in 'public policy.'" (Doc. 78 at 3). This

---

[1] *See supra* Section III(D) for a partial analysis of helpfulness.

calls Anderson's qualifications into question. The court finds that Anderson is qualified to act as an expert witness in this case.

"While . . . training or education may provide possible means to qualify, experience in a field may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear: expert status may be based on 'knowledge, skill, experience, training, or education.'" *Frazier*, 387 F.3d at 1260-61. Anderson's training, education, and experience all qualify him as an expert: his undergraduate and graduate degrees involved extensive coursework in economics, he worked as an economist for multiple employers, he founded and serves as CEO of Anderson Economic Group, he has published multiple journal articles on economic topics, and he has been recognized by professional economics societies. (Doc. 51-12 at 94-115). Anderson Economic Group has previously done work for numerous automotive manufacturers, including GM, *id.* at 94, and in the first few months of 2025, several major news outlets cited Anderson Economic Group regard to automotive economic issues.[2] Anderson's expert testimony regarding damages has been admitted in multiple automotive cases. *See, e.g., Action Nissan, Inc. v. Hyundai Motor Am.*, No.

---

[2] *See, e.g.,* The Editorial Board, *Trump's Tariffs Will Punish Michigan*, Wall St. J. (Feb. 5, 2025), https://www.wsj.com/opinion/trump-tariffs-american-auto-industry-anderson-economic-group-canada-mexico; Sean Tucker, *Analysis: Softened Tariffs Will Still Increase Car Prices*, Kelley Blue Book (Sept. 17, 2024), https://www.kbb.com/car-news/analysis-softened-tariffs-will-still-increase-car-prices/.

6:18-cv-380, 2022 WL 17370293 (M.D. Fla. Aug. 22, 2022), *aff'd*, No. 22-13153, 2024 WL 3888756 (11th Cir. Aug. 21, 2024), (affirming a $16 million verdict for Anderson's client); *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, No. 3:03-cv-00029, 2009 WL 10672789 (D. Alaska Sep. 16, 2009) (permitting Anderson to be *voir dired* and subsequently admitting his testimony), *aff'd*, 738 F.3d 960, 968 (9th Cir. 2013). This is persuasive experience. Based on the foregoing facts, the court finds that Anderson is qualified to serve as an expert in this case.

**II) Reliability**

GM does challenge the reliability of Anderson's opinions and methodology. An expert witness's testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods," and the expert's opinions must reflect "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Serra retained Anderson to provide an expert report on lost sales and lost profits in this matter. (Doc. 51-12). Anderson's lost sales and lost profits analyses are sufficiently grounded in GM's own metrics and industry data. He used GM's

5

Retail Sales Index and Planning Volume projections—metrics that GM itself uses to gauge expected dealer performance—as well as comparisons to similar dealerships' market penetration. *Id.* at 51. These provide an objective basis for estimating how many more vehicles Serra *would have sold* if not constrained by GM's allocations. While GM criticizes Anderson for assuming Serra would sell every additional vehicle allocated, *id.*, this assumption aligns with evidence that dealers typically sell whatever inventory they receive over time, (doc. 63-12 at 11). In fact, GM's own expert, Jay Lytle, opined that "over time dealership sales will equal the number of vehicles allocated." *Id.* And GM requires its dealers to maintain a retail sales index of 100—that is, to sell the number of vehicles GM forecasts for their market and that Serra insists should be allocated to it. (Doc. 46-5 at 15). Thus, Anderson's premise that Serra could sell the additional vehicles is supported by both GM's expert and GM's standards. Any dispute about *how quickly* Serra would sell them goes to the weight of the evidence, not its admissibility.

GM's reliance on *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653 (S.D.N.Y. 2018)—where a similar Anderson analysis was excluded—is misplaced. In *Dependable Sales*, Anderson assumed that 100% of competitor sales were lost sales for 108 different dealerships across the country without accounting for other causes. *Id.* at 659-65. He also used a single nationwide average profit per car for all dealerships, despite the fact that cars from at least eight different

automotive manufacturers—ranging from Hyundai to Porsche—were being sold. *Id.* The sheer breadth of and the unsupported leaps in that Lanham Act false-advertising case led the court to find an analytical gap in causation and profit calculation. *Id.* at 662-65. The court ultimately excluded Anderson's testimony. *Id.* at 667. By contrast, in this case Anderson's analysis is focused on one dealership (Serra) and one manufacturer (GM) in a defined market, using GM's own dealership performance standards as a benchmark. (Doc. 51-12).

Another court has already rejected such a blanket comparison to *Dependable Sales*. In *Coyle Nissan, LLC v. Nissan North America, Inc.*, No. 4:18-cv-75, 2021 WL 9098120 (S.D. Ind. Apr. 13, 2021), the manufacturer similarly urged exclusion of Anderson's testimony by citing *Dependable Sales*, but the court found Anderson's methods reliable and the case factually distinguishable. *Id.* at *7. Anderson had examined market data, dealer financials, sales figures, and demographics in *Coyle Nissan*, *id.* at *6, and the court ruled that his assumptions were grounded in facts and data, not mere guesswork, *id.* at *7. It held that *Dependable Sales* was "readily distinguishable" because that case's massive multi-dealer Lanham Act scenario did not apply to a single-dealer contract dispute. *Id.* Here too, Anderson's use of Serra's market demand, GM's internal targets, and regional dealer averages provides the specific foundation that the *Dependable Sales* court found lacking.

GM also argues that Anderson improperly ignored Serra's actual (poor) profitability and instead applied an average profit per vehicle from other regional dealers (doc. 51-11 at 9-12), similar to a methodology criticized in *Dependable Sales*, *see Dependable Sales & Serv., Inc.*, 311 F. Supp. 3d at 667. However, Anderson explained that Serra's own financials were abnormally low *because GM's failure to allocate enough inventory made Serra unprofitable*. (Doc. 46-19 at 82-83; Doc. 51-11 at 214). Indeed, the entire point of a lost profits analysis is to determine what profits *would have been* in the absence of the allegedly harmful conduct. Constraining Serra's lost profit calculation by requiring it to consider its own depressed profits when considering what its profits *should* have been would run counter to this goal. And using the regional average gross profit per new vehicle provides a reasonable estimate of what Serra could have earned if it, like other dealers, had adequate inventory. *See Mason & Dixon Lines, Inc. v. Byrd*, 601 So. 2d 68, 70 (Ala. 1992) (noting that lost profits must be "capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required").

Finally, under *Daubert* and *Kumho Tire*, an expert's opinion must have a reliable foundation and may not merely be the expert's *ipse dixit*, or bare assertion. *See Kumho Tire Co.*, 526 U.S. at 157. GM claims that Anderson's opinions are

8

unsupported *ipse dixit*, but this assertion is contradicted by the record. Anderson's report explicitly lays out how he reconstructed GM's allocation process from internal documents, (doc. 51-12 at 160), identified nine arbitrary aspects of that process (e.g., unexplained use of tiers, inconsistent time frames for sales data, lack of criteria for discretionary allocations), *id.* at 36, and then used GM's own sales potential metrics to quantify lost sales, *id.* at 51. And he did not simply assert in a vacuum that Serra lost sales due to GM's allegedly unlawful allocations; he tied each lost sale estimate to data points GM itself calculated for Serra's market. *Id.* This kind of analysis is not *ipse dixit* because it is "'supported by appropriate validation—i.e., 'good grounds,' based on what is known.'" *Frazier*, 387 F.3d at 1261 (quoting *Daubert*, 509 U.S. at 590).

As the Ninth Circuit explained in *Alaska Rent-A-Car* when upholding Anderson's testimony, the trial judge's role is to filter out "unreliable nonsense," not to exclude an expert just because the expert's assumptions could be challenged on cross-examination. *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969. Criticisms like choice of comparator or market baseline "go to the weight of the testimony and its credibility, not its admissibility." *Id.* at 970. Although the 2023 revision to Rule 702 does emphasize the court's role as gatekeeper, it remains true that "once the court has found it more likely than not that the admissibility requirement has been met,

9

any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

Here, it is more likely than not that the admissibility requirement has been met. Any gaps or debatable assumptions in Anderson's opinion (such as not conducting a customer survey or perfectly allocating sales among competing dealers) are points that GM can attack on cross-examination and by presenting contrary evidence, but they do not render the methodology unreliable to the point of exclusion.

### III) Legal Conclusions

Finally, GM raises concerns that Anderson makes legal conclusions throughout his report. Specifically, GM is concerned about Anderson's conclusions that GM's allocation process is "arbitrary," "inconsistent with their contract," "not consistent with the Alabama statute," and the "proximate cause" of Serra's damages. (Doc. 78 at 7, 19-20).

#### A) Arbitrariness

GM argues that Anderson may not testify that GM's allocation system is "arbitrary" because whether GM's allocation system is arbitrary is a question of fact for the jury. (Doc. 78 at 19-20). GM also argues that because Anderson's finding of arbitrariness permeates his entire report, Anderson should not be allowed to testify at all. *Id.*

Under the Alabama statute at issue in this case, a vehicle manufacturer's allocation system may not be "arbitrary." Ala. Code § 8-20-4(3)(a) (1975). Thus, to testify that GM's allocation system is arbitrary is to testify that GM violated Alabama law. And under the Federal Rules:

> [E]xperts may not testify to the legal implications of conduct or tell the jury what result to reach. Rather, the court must be the jury's only source of law, and questions of law are not subject to expert testimony. [C]ourts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law.

*Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir. 2018) (internal quotation marks and citations omitted). Because in testifying that GM's allocation system is arbitrary Anderson would indeed be substituting for the court in charging the jury regarding the applicable law, Anderson may not testify that GM's allocation system is arbitrary.

However, it does not follow that Anderson's entire testimony should be excluded. Instead of saying that a part of GM's allocation process is "arbitrary," Anderson can simply use a different word, such as "unexplained" or "discretionary," and leave it to the jury to determine if such unexplained and discretionary decisions constitute arbitrary behavior. This simple change in word choice is sufficient to bring Anderson's testimony in line with Rule 702.

### B) Contractual Interpretation

GM also argues that Anderson may not opine that GM's allocation process is "inconsistent with their contract." (Doc. 78 at 7). Such testimony from Anderson would entail first testifying as to the meaning of contractual provisions and then testifying that GM breached those contractual provisions.

As to the first issue—whether Anderson may testify as to the meaning of contractual provisions—the answer is nuanced. "The interpretation of a written contract generally is a matter of law to be determined by the court." *Chick-Fil-A, Inc. v. CFT Dev., LLC*, No. 5:07-cv-501-OC-10GRJ, 2009 WL 1754058, at *3 (M.D. Fla. June 18, 2009). And "questions of fact in contract interpretation arise only upon a finding of ambiguity." *S.-Owners Ins. Co. v. Tasman Servs. LLC*, No. 8:21-cv-1510, 2022 WL 4290437, at *4 (M.D. Fla. Sept. 16, 2022), *aff'd*, No. 22-13455, 2023 WL 2707255 (11th Cir. Mar. 30, 2023). "Expert testimony purporting to interpret the terms of a contract is therefore proper only after a court has determined contractual language to be ambiguous." *Id.* at *1 (citing *Armstead v. Allstate Prop. & Cas. Ins. Co.*, No. 1:14-cv-586, 2016 WL 4123838, at *5 (N.D. Ga. July 1, 2016)).

However, this does not mean that an expert witness may, after a finding of ambiguity, flatly state their interpretation of an ambiguous contract term. This is because "[t]he Eleventh Circuit and courts within the Eleventh Circuit have excluded expert testimony where it is simply a reiteration or recasting of a parties' [sic]

interpretation of a contract." *FNB Bank v. Park Nat'l Corp.*, 996 F. Supp. 2d 1187, 1192 (S.D. Ala. 2014) (citing *N. Am. Specialty Ins. Co. v. Wells*, No. CV412-146, 2013 WL 4482455, at *3 (S.D. Ga. Aug. 19, 2013)). Such testimony is "nothing more than what lawyers for the parties can argue in closing argument." *N. Am. Specialty Ins. Co.*, 2013 WL 4482455, at *3 (quoting *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005)).

Anderson, then, may not testify that the contract between GM and Serra requires GM to consider Serra's sales requirements and sales potential, because such testimony by Anderson would simply constitute a reiteration of Serra's interpretation of the contract. This type of testimony is properly excluded regardless of whether it is "within the scope of [the expert's] undisputed knowledge, training, and qualifications." *Id.* Once the court has found a contract provision to be ambiguous, what an expert witness *may* provide is extrinsic evidence—such as that of trade usage or industry meaning—to guide the *jury's* interpretation of the provision. *See FNB Bank*, 996 F. Supp. 2d at 1192; *S.-Owners Ins. Co.*, 2022 WL 4290437, at *4. Thus, although Anderson may not interpret the contract himself, he may provide extrinsic evidence to help the jury interpret the contract.

As to the second issue—whether Anderson may testify that GM breached the contract—the answer is no. The Eleventh Circuit, in *Montgomery v. Aetna Casualty & Surety Company*, 898 F.2d 1537 (11th Cir. 1990), noted that interpretation of

13

contracts is a question of law to be decided by the judge. *Id.* at 1541 n.9. And "[t]estimony that conduct did or did not breach [a contract] appears plainly to be captured by *Montgomery*." *FNB Bank*, 996 F. Supp. 2d at 1192 (citing *Montgomery*, 898 F.2d at 1541 n.9). Thus, Anderson may not testify that GM breached its contract with Serra.

### C) Statutory Interpretation

GM also argues that Anderson may not state that GM's allocation process is "not consistent with the Alabama statute." (*See* Doc. 48-21 at 12). This is because, except hypothetically in very limited circumstances,[3] "statutory interpretation is a legal question for a judge, not a factual question for the trier of fact." *United States v. F.E.B. Corp.*, 52 F.4th 916, 932 (11th Cir. 2022). Anderson's testimony falls into no hypothetical limited exception. Stating that GM's allocation system is "not consistent with the Alabama statute" does "no more than offer expert opinion in the form of legal conclusions, . . . risk[ing] confusing, prejudicing, or misdirecting the jury." *Commodores Entm't Corp.,* 879 F.3d at 1129. Such testimony is properly excluded.

---

[3] "We can imagine circumstances in which such testimony—say, about foreign law or about the historical underpinnings of a term or phrase—might be helpful." *F.E.B. Corp.*, 52 F.4th at 932 n.8 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) (analyzing the original public meaning of the Second Amendment)).

### D) Proximate Cause

Finally, GM argues that Anderson may not state that GM's allocation process is the "proximate cause" of Serra's losses because to state the existence of proximate cause is to make an improper legal conclusion. (Doc. 78 at 7). In support of this contention, GM relies on *Green v. Alabama Power Co.*, 597 So.2d 1325 (Ala. 1992). The court in *Green* stated that "[a] proximate cause issue is ordinarily a question of fact to be determined by a jury. It becomes a question of law, however, when 'there is a total lack of evidence from which the factfinder may reasonably infer a direct causal relation.'" *Id.* at 1327-28 (citations omitted)). GM's reliance on *Green* is misplaced. *Green* stands for the proposition that in most cases, proximate cause is an issue for the jury, not for the judge. It has little, if anything, to do with expert witnesses.

And expert witnesses are regularly allowed to testify as to proximate cause. *See McDowell v. Brown*, 392 F.3d 1283, 1296 (11th Cir. 2004) (requiring expert testimony as to proximate cause in a medical malpractice case); *Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000) (noting that expert testimony on proximate cause is generally required to prove legal malpractice); *Hacking v. United States*, No. 19-14449, 2021 WL 4973904, at *5 (S.D. Fla. July 28, 2021) ("The record demonstrates that a genuine dispute of material fact exists among the parties' expert witnesses as to whether CNM Coleman's failure to alert Dr. Zollicoffer was the proximate cause

of L.A.H.'s injuries."). Note also, as discussed below, that although GM's own expert, Jay Lytle, does not use the words "proximate cause," he discusses causation throughout his report. (*See* Doc. 51-14).

The more salient issue is whether Anderson's testimony as to proximate cause will be *helpful* to the trier of fact. *See Frazier*, 387 F.3d at 1260 (holding that expert testimony must assist the trier of fact). "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63 (citations omitted).

Stripped to its core, the causal chain is one that a layperson can easily grasp: a reduction in vehicle allocations necessarily produces a reduction in inventory, which in turn yields fewer sales and lower profits. But this causal chain is heavily contested. Throughout Anderson's report, he delves into the finer points of how exactly GM's allocation system caused Serra financial harm. (*See, e.g.,* Doc. 51-12 at 31-33 (providing an empirical analysis)); *id.* at 133 (documenting the post-pandemic recovery of the automotive industry). The complexity of the issue of proximate cause is evidenced by Lytle's own analysis of causation, which contests Anderson's finding of proximate cause. (*See* Doc. 51-14 at 6 (contesting Anderson's causation analysis on the basis of his empirical analysis)); *id.* at 8 (contesting

16

Anderson's causation analysis on the basis of the inequitable result created by his use of inventory totals); *id.* (contesting Anderson's causation analysis on the basis of inventory issues related to the COVID-19 pandemic); *id.* at 12, 18 (contesting Anderson's causation analysis on the basis of Serra's sales history); *id.* at 19 (contesting Anderson's causation analysis on the basis of the performance of various Chevrolet model lines); *id.* at 21 (contesting Anderson's causation analysis on the basis of Serra's "turndown" rate); *id.* at 23 ("Opinion 6: The AEG Report's 'Estimate of Lost Sales,' and subsequent damage claim is fundamentally flawed, based upon the faulty assumption that lack of allocations caused Serra's poor sales performance."). These are issues on which the opinions of an expert economist who is familiar with the automotive industry would be helpful to the trier of fact.

**IV) Conclusion**

For the reasons explained above, the court finds that Anderson and his proffered opinions satisfy Rule 702 with respect to qualification, helpfulness to the trier of fact, and reliability of the methodologies employed. On these issues, the motion to exclude is **DENIED**.

However, certain portions of Anderson's report and anticipated testimony improperly articulate legal conclusions that are not the proper subject of expert opinion. As to those matters, the motion is **GRANTED IN PART**.

To ensure clarity on the permissible scope of expert testimony, it is **ORDERED** that Serra shall revise and re-submit within **twenty-one (21) days** a list of Anderson's opinions that conform to the limitations set forth in this Order. After Serra files the revised opinions, it is **ORDERED** that GM, within **fourteen (14) days** of Serra's submission of Anderson's revised opinions, submit supplemental briefing directed specifically to the admissibility of any remaining disputed opinions, if any. Serra shall then have **seven (7) days** to submit a brief in response.

A further *Daubert* hearing will be scheduled by separate order to address any outstanding issues following submission of the revised report and supplemental briefing.

**DONE** and **ORDERED** on December 19, 2025.

_____
**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE