# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |
|---|---|
| **SERRA CHEVROLET, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**GENERAL MOTORS, LLC,**<br><br>Defendant. | Case No. 2:23-cv-1675-HDM |

## MEMORANDUM OPINION AND ORDER

Plaintiff Serra Chevrolet, Inc. ("Serra") sues Defendant General Motors, LLC ("GM") for breach of contract, violations of Alabama's Motor Vehicle Franchise Act (the AMVFA), negligence, wantonness, and violations of the Dealer's Day in Court Act. (Doc. 1). Serra moved for partial summary judgment, (doc. 45), and GM moved for summary judgment on all issues, (doc. 47). This court denied Serra's motion for partial summary judgment and granted in part and denied in part GM's motion for summary judgment. *See Serra Chevrolet, Inc. v. Gen. Motors, LLC*, No. 2:23-cv-1675, 2025 WL 3903089 (N.D. Ala. Dec. 19, 2025). Specifically, this court granted GM's motion for summary judgment as to: (1) Count I, on the issues of whether GM violated Sections 8-20-4(1)(h) and 8-20-4(2) of the AMVFA; (2) Count III, negligence; (3) Count IV, wantonness; and (4) Count V, violation of the Dealer's

Day in Court Act. *Id.* This court denied GM's motion for summary judgment as to: (1) Count I, on the issue of whether GM violated Section 8-20-4(3)(a) of the AMVFA; and (2) Count II, breach of contract. *Id.* at *9.

This case is back before the court on a motion for reconsideration by GM. (Doc. 105). GM asks the court to let stand its partial grant of summary judgment to GM but to reconsider its denial of summary judgment as to whether GM violated Section 8-20-4(3)(a) of the AMVFA or breached its contract with Serra. For the reasons stated below, the court **DENIES** GM's motion for reconsideration.

I.  BACKGROUND

Serra is a party to a Dealer Sales and Service Agreement with GM ("the Agreement"), under which Serra can purchase new motor vehicles manufactured by GM and sell the same to retail customers. (Doc. 51-8; Doc. 51-9). Two sections of the Agreement are relevant here. Article 6.1, "Sale of Motor Vehicles to Dealer," provides in pertinent part:

> General Motors will endeavor to distribute new Motor Vehicles among its dealers in a fair and equitable manner. Many factors affect the availability and distribution of Motor Vehicles to dealers, including component availability and available production capacity, sales potential in Dealer's Area of Primary Responsibility, varying consumer demand, weather and transportation conditions, governmental regulations and other conditions beyond the control of General Motors. General Motors reserves to itself discretion in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final.

(Doc. 51-9 at 12). Article 6.4.1, "Motor Vehicle Inventory," provides:

> Dealer recognizes that customers expect Dealer to have a reasonable quantity and variety of current model Motor Vehicles in inventory. Accordingly, Dealer agrees to purchase and stock and General Motors agrees to make available, subject to Article 6.1, a mix of models and series of Motor Vehicles identified in the Motor Vehicle Addendum in quantities adequate to enable Dealer to fulfill its obligations in its Area of Primary Responsibility.

*Id.* at 13. The method that GM uses to allocate vehicles among dealerships is explained in detail in several publications made available to dealers, including Serra. (Doc. 48-7; Doc. 48-9). The Agreement stipulates that it is to be governed by Michigan law. (Doc. 46-5 at 32).

The vehicle allocation process relies primarily upon a calculation of "Available Days Supply" or "ADS." (Doc. 48-2 at 3-4). The ADS calculation is a formula that uses each individual dealer's daily sales rate to determine how long that dealer's current inventory will last. *Id.* at 10. Thus, under this system, a dealer that sells more vehicles will be allocated more of those same models of vehicles in order to keep up with demand. *Id.* at 8, 23. Once GM allocates vehicles to a dealer, it is still up to the dealer to actually order those vehicles. (Doc. 48-12 at 14).

GM assigns to each of its dealers an "Area of Primary Responsibility." (Doc. 46-5 at 4-5). With respect to a dealer's area of primary responsibility, the Dealer Agreement provides: "Dealer is responsible for effectively selling, servicing and otherwise representing General Motors Products in the area designated in a Notice

3

of Area of Primary Responsibility. The Area of Primary Responsibility is used by General Motors in assessing performance of dealers and the dealer network." *Id.*

GM has a dealer performance metric known as the Retail Sales Index, which is not related to the allocation process. (Doc. 48-2 at 5). A retail sales index is a percentage determined by a fractional equation which divides a dealer's actual total retail sales during a particular time period by the dealer's expected sales as determined by model segment. (Doc. 46-5 at 15). In other words, the mathematical representation of a retail sales index is total actual sales (the numerator) over total expected sales by model segment (the denominator), multiplied by 100. *Id.* GM's retail sales index calculation is applied to Serra in the same manner as it is applied to other dealers in Alabama. (Doc. 48-12 at 29-30). The Dealer Agreement states: "Dealer's sales performance will be rated as provided in the General Motors Sales Evaluation process. To achieve a 'Satisfactory' performance rating, Dealer must have a retail sales index of at least 100. General Motors expects Dealer to pursue available sales opportunities exceeding this standard." (Doc. 46-5 at 15). GM can terminate the Dealer Agreement if Serra "fails to adequately perform its sales . . . responsibilities" and fails to correct that issue after notice. *Id.* at 22.

## II. STANDARD OF REVIEW

"[A] district court's authority to revise interlocutory orders . . . comes from Rule 54(b) . . . ." *Herman v. Hartford Life & Acc. Ins. Co.*, 508 F. App'x 923, 928 n.1 (11th Cir. 2013) (per curiam). Under Rule 54(b) of the *Federal Rules of Civil Procedure*,

> [A]ny order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). "Although Rule 54(b) does not delineate the parameters of a district court's discretion to reconsider interlocutory orders," the Eleventh Circuit "ha[s] at least indicated that Rule 54(b) takes after Rule 60(b)." *Herman*, 508 F. App'x at 928 n.1 (citing *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 569 (11th Cir. 1990) (reviewing a district court's grant of a motion to reconsider a denial of summary judgment as if it were a Rule 60(b) motion)).

"Rule 60(b) allows a party to seek relief . . . based on the following limited circumstances: (1) mistake or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) the judgment is void; (5) the judgment has been discharged; and (6) any other reason that justifies relief." *Ctr. for Individual Rts. v. Chevaldina*, No. 21-13453, 2022 WL 4462246, at *4 (11th Cir. Sept. 26, 2022) (per curiam) (internal quotation marks omitted). "A Rule 60(b) motion is intended 'only for extraordinary

5

circumstances.'" *Id*. (quoting *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1316 (11th Cir. 2000)).

"A motion for reconsideration cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (internal quotation marks omitted). *See also Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1292 (11th Cir. 2001) ("Motions for reconsideration should not be used to raise legal arguments which could and should have been made before the judgment was issued."). Nor may a motion for reconsideration be used merely to "show the [c]ourt how it could have done it better the first time." *Hysten v. Fargolman Mgmt. Grp.*, No. 1:21-cv-00791, 2021 WL 7708389, at *1 (N.D. Ga. June 1, 2021) (internal quotation marks omitted).

## III.   ANALYSIS

GM argues that it is entitled to reconsideration for five reasons: (1) this court created a manifest injustice and violated the party presentation rule by ruling on an issue not presented by the parties; (2) this court did not properly apply the concept of ambiguity; (3) this court was incorrect in determining that whether the Agreement was a requirements contract rested on a genuine issue of material fact; (4) this court failed to address a dispositive issue; and (5) this court was incorrect in determining

that whether GM violated the AMVFA rested on a genuine issue of material fact. (Doc. 106).

### A. Party Presentation

GM argues that this court erred in holding that the Agreement was ambiguous because neither GM nor Serra explicitly raised the issue of ambiguity. *Id.* at 9-12. The court finds this argument puzzling.

First, the court notes that GM misconstrues the party presentation rule, which generally constrains courts to consider only those issues framed and presented by the parties. *See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022). The Supreme Court has recognized that once "an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). *See also U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990) ("[A] court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief.")). Thus, even if the parties failed to raise the theory of ambiguity, because the parties raised the issue of contractual interpretation, this court was free to find that the contract was ambiguous.

But even under GM's characterization of the party presentation rule, its argument is unpersuasive. GM claims that "both parties agree that the Agreement was unambiguous," and thus that ambiguity was not before the court. (Doc. 106 at 7). While it may be true that both parties argued that the contract was unambiguous, GM's characterization ignores the fact that GM and Serra claim that the contract is unambiguous in *totally contradictory ways*. *See Serra Chevrolet, Inc.*, 2025 WL 3903089, at *2-5 (explaining GM's and Serra's conflicting interpretations of the contract). Indeed, it is because of this disagreement that construction of the Agreement is the basic and central issue in this case. *See id.*

GM claims that this court's ruling on ambiguity created a manifest injustice, thus justifying relief, because GM "has never had the opportunity to address any purported ambiguity." (Doc. 106 at 7). This is untrue. The parties used roughly twelve pages of their summary judgment briefing to explain both why their own interpretation of the contract is correct and why the opposing party's interpretation of the contract is incorrect. (*See* Doc. 54, Brief for GM, at 28; Doc. 55, Brief for Serra, at 11, 13-14; Doc. 73, Response for Serra, at 27; Doc. 74, Response for GM, at 28-31; Doc. 83, Reply for GM, at 5-6; Doc. 84, Reply for Serra, at 4-7). GM could have used this space to argue that Serra's motion should be denied on its own merits, in which case an argument of ambiguity would have been tactically advantageous for GM. Instead, GM used this space to argue that Serra's motion should be denied

*and that its own motion should be granted*, which required a finding of unambiguity. This appears to have been a tactical choice on GM's part, and GM may not now choose differently.

In the alternative, GM argues that it did not "have any reason to anticipate or raise any arguments in its summary judgment briefing concerning ambiguity." (Doc. 106 at 16). If a plaintiff argues that a contract term unambiguously means X, and the defendant argues that the contract term unambiguously means Y, there are three foreseeable outcomes: a finding that the term means X, a finding that the term means Y, and a finding that the term is ambiguous. The court cannot speak to whether GM anticipated a finding of ambiguity, but it is certainly not true that GM had no *reason* to anticipate a finding of ambiguity.

Thus, GM's party-presentation argument is unpersuasive.

## B. Ambiguity Analysis

According to GM, "[h]ad Serra argued that the contract was ambiguous, GM would have responded at least with ample authority to the contrary." (Doc. 106 at 17). GM then proceeds to present evidence on the issue of ambiguity. *Id.* at 12-18.

"Motions for reconsideration should not be used to raise legal arguments which could and should have been made before the judgment was issued." *Sanderlin*, 243 F.3d at 1292. The impetus to address ambiguity was not solely on Serra; it was a burden shared by GM. As noted *supra*, GM failed to address ambiguity at the

9

summary judgment stage, where it should have been addressed. Thus, GM may not now raise legal arguments on the issue, and the court need not consider them.

Nonetheless, the court will address some of GM's contentions. First, GM argues that this court's analysis "did not identify any language that irreconcilably conflicts within the DSSA," as it was required to under Michigan law. (Doc. 106 at 19). This is incorrect. The court explicitly quoted the following language from the Agreement: (1) "Many factors affect the availability and distribution of Motor Vehicles to dealers, including . . . sales potential in Dealer's Area of Primary Responsibility," and (2) "General Motors reserves to itself discretion in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final." *Serra Chevrolet Inc.*, 2025 WL 3903089 at *2.

As GM reiterates in its motion for reconsideration, "courts must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003). GM leans heavily on this rule in arguing that any finding that requires GM to consider dealers' sales potential renders the discretionary clause of the Agreement nugatory. (Doc. 106 at 15-17, 22). GM makes no mention of the inverse argument—that a finding allowing GM complete discretion over allocations would render nugatory the clause stating that sales potential affects allocations. GM, of course, argues that this clause merely allows

GM to consider sales potential rather than requiring GM to consider it. *Id.* at 21. But, as this court noted in its opinion, that clause "does not list sales potential as a factor that could, might, or may be considered, but as a factor that *does* affect the availability and distribution of Motor Vehicles to dealers." *Serra Chevrolet Inc.*, 2025 WL 3903089 at *3. The court will not ignore the plain language of the Agreement in order to avoid a finding of ambiguity. Because these two provisions irreconcilably conflict, the contract is ambiguous.

### C. Requirements Contract Analysis

Serra devoted significant energy to the issue of whether the Agreement is a requirements contract. (*See* Doc. 55, brief for Serra, at 17-18; Doc. 73, response for Serra, at 27-28; Doc. 84, reply for Serra, at 4-5). GM did not address this issue at all in its briefing. (*See generally* Doc. 54, brief for GM; Doc. 74, response for GM; Doc. 83, reply for GM). At oral argument, GM briefly discussed this issue, contending that a requirements contract must contain a price term and alleging that the Agreement did not. Transcript of Oral Argument at 18-19, 35-36, *Serra Chevrolet Inc.*, 2025 WL 3903089. In doing so, GM cited no case law, nor did it otherwise cite to any authority for its contentions. *See id.* Nonetheless, this court fully addressed this issue—including GM's limited contentions—in its summary judgment order. *Serra Chevrolet, Inc.*, 2025 WL 3903089, at *4-5.

GM now attempts to present six pages of arguments on this issue. (*See* Doc. 106 at 24-29). It may not do so, as these arguments "could and should have been made before the judgment was issued." *Sanderlin*, 243 F.3d at 1292. GM may not now have a proverbial second bite at the apple.

### D. Failure to Address a Dispositive Issue

GM argues that "the Court also erred in failing to address GM's assertions that even if the contract could somehow be read as Serra proposes, the issue is moot because the undisputed evidence established that GM made available sufficient vehicles for Serra to achieve its sales goals." (Doc. 106 at 30). This court found that (1) the relevant terms of the Agreement are ambiguous, and (2) "whether GM breached its contract with Serra depends on whether the Agreement requires GM to provide enough vehicles for Serra to fulfill its sales obligations," and "that ambiguity must be settled in order to determine whether GM complied with the AMVFA." *Serra Chevrolet, Inc.*, 2025 WL 3903089, at *6.

Even if, as GM asserts, its literal addition and subtraction go unchallenged by Serra,[1] whether the results of GM's math satisfy its requirements under the Agreement and the AMVFA is hotly contested between the parties, with substantive evidence being offered by both GM and Serra to support their positions. (*See*, *e.g.*,

---

[1] Serra takes issue with GM's calculations for a variety of reasons, including GM's inclusion of demonstrators, service loaners, and irrelevant time periods in the calculations. (Doc. 73 at 23-26).

12

Doc. 73 at 23-26). Indeed, prior to publishing its summary judgment order, this court performed its own calculations based on the available evidence, and it did *not* find that "the undisputed evidence established that GM made available sufficient vehicles for Serra to achieve its sales goals."[2] The fact remains that there is a genuine issue of material fact as to exactly how many vehicles GM was required to allocate to Serra.

### E. AMVFA

Finally, GM argues that "the Court erred in denying summary judgment on the [AMVFA] claim for the same reasons as set forth above." (Doc. 106 at 31). GM argues that, as a matter of law, its allocation system is not "arbitrary" under the AMVFA. (Doc. 106 at 32).

This court held that the genuine issue of material fact regarding whether GM breached the Agreement flows through to the AMVFA issue. *Serra Chevrolet, Inc.*, 2025 WL 3903089, at *6. The court adopted a definition of "arbitrary" that includes "depending on individual discretion," as other courts have done. *Id.* at *5 (citing *Tuscaloosa Hyundai, Inc. v. Hyundai Motor Am., Inc.*, No. 7:21-cv-00571, 2023 WL 6296929, at *6 (N.D. Ala. Sept. 27, 2023); *Black's Law Dictionary* (9th ed. 2009)).

---

[2] Because the data underlying these calculations was filed under seal, the court has not, and will not, incorporate these calculations into its opinion. However, in light of GM's motion for reconsideration, the court will attach these calculations as a sealed exhibit and make them available to the parties. The court does not hold out these calculations as conclusive. Rather, they are a tool that was used by the court to determine whether a genuine issue of material fact exists.

If GM was not acting in a manner that was constrained by the Agreement, then its actions depended on individual discretion and may have been arbitrary. This is supported by the idea that, as this court stated, "[a]rbitrariness under the AMVFA may be tied to contract compliance or noncompliance." *Id.* at *6 (citing *Gen. Motors Corp. v. Serra Chevrolet, Inc.*, No. 2:09-cv-00490, 2009 WL 10688427, at *5 (N.D. Ala. Apr. 17, 2009)).

Because the issue of arbitrariness is affected by the issue of contract compliance or noncompliance, this court held that the genuine issue of material fact regarding Count II, breach of contract, flowed through to this issue. *Id.* That genuine issue of material fact stems from the ambiguity of the Agreement. GM takes issue with this court's finding of ambiguity—and thus takes issue with its effects here—but, as discussed *supra*, this court will not reconsider that finding.

GM also takes issue with this court's holding on the grounds that "for purposes of determining whether GM's actions concerning allocation are 'arbitrary' for the purposes of the Alabama statute, GM's compliance with its own contractual language is, by express statute, irrelevant." (Doc. 106 at 33). GM cites Section 8-20-14 of the Alabama Code for this proposition. That Section states that it "shall apply to all franchise or dealer agreements" and "shall supersede and control all provisions of any franchise or dealer agreement inconsistent with . . . the Motor Vehicle Franchise Act." Ala. Code § 8-20-14.

14

GM overreads this statute. Section 8-20-14 establishes preemption, meaning that if the Agreement were to, by its terms, conflict with the AMVFA, the AMVFA would control. It does not mean that violations of the Agreement may not be considered in determining whether GM's allocations were arbitrary under the AMVFA. In other words, it isn't an evidentiary exclusionary rule. Indeed, it would be strange if the AMVFA—which makes it unlawful to establish an arbitrary allocation system—also made it unlawful to, when analyzing arbitrariness, consider the very contract that establishes that allocation system.

## IV.  CONCLUSION

Nothing in GM's motion demonstrates mistake or excusable neglect, newly discovered evidence, fraud, or any other reason that justifies relief. For the foregoing reasons, GM's motion for reconsideration, (doc. 105), is **DENIED**.

**DONE** and **ORDERED** on January 30, 2026.

_____
**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE